## Lesniakowski Appeal

*Zeman & Zeman,* for appellant.

*George J. Modrak,* for respondents.

GIBSON, P. J., January 19, 1948.—This is an appeal from the Police Civil Service Commission of the Borough of Canonsburg, to which an answer was filed. At the hearing held by us, the record of the hearing before the commission was presented and no additional evidence was offered. We have carefully gone through

the lengthy record of proceedings before the commission in an endeavor to find justification for the action of the several officers of the borough and of the commission.

From the petition for appeal, the answer, the arguments and briefs, we find there are few disputed questions of fact. The facts are as follows, and we so find:

The Borough of Canonsburg has a police force exceeding three in number, and, as required by law, had, at the time of the hearing hereinafter specified, a Police Civil Service Commission, composed of David Davidson, chairman, and George Foley and John Hollman, members. David Davidson at that time was president of council of the borough, a member of the councilmanic police committee, and, in addition, was the sealer of weights and measures duly appointed by the Commissioners of Washington County. On and for several years prior to May 4, 1947, Norbert Lesniakowski was a lieutenant on the police force of the Borough of Canonsburg and was so engaged on that date. While performing his duties, the officer ascertained that a number of well-known characters were gathering in a three-story frame building known as the Coffee Shoppe, operated by Mike Pihakas. This place had a well-established reputation over a long period of time as being a gambling house. It had been raided many times by the police. It was so notorious that Mike Pihakas, the proprietor, testified before the Police Civil Service Commission: "I paid enough fine to pay for this building."

The officer secured two other police officers for assistance, and without consulting the chief of police, engaged in a raid on this building about 4 a.m., on Sunday morning, May 4, 1947. The proprietor and visitors were in rooms on the third floor, to which there was no access except through a door covered with iron. In this door was a peep hole covered by a shutter oper-

ated from the inside. This door was locked and admission could not be secured. The officers attempted by a ruse to have Mike Pihakas, who came to the door, open it. When this did not succeed, they informed him that the police were there and demanded admission. Previous to this, the officer here involved had heard the placing of bets, the rattle of dice against a banking board, and those noises which proceed from a crap game. Upon Mike Pihakas being informed that the police were demanding admission, he announced, loud enough for the officers to hear, "Break it up—police". The door was not opened, and it was necessary for the officers to break it in. They found there Mike Pihakas and a number of visitors. Mike Pihakas was charged under an ordinance with operating a disorderly house. The visitors placed forfeits and were released after their names and addresses had been taken.

At a subsequent hearing before the burgess, the burgess had requested the police committee of council to be present. The ordinance referred to provided, in the definition of a disorderly house, that disorderly house included a place where gambling was carried on, and it had been the practice of the Borough of Canonsburg, under the direction of some superior who is not designated, that prosecutions were brought under this ordinance and fines were imposed for a violation of the ordinance, instead of the course required by law of prosecution under the Criminal Code prohibiting the maintenance of gambling houses. Apparently previous to the hearing before the burgess, someone accused the officer here involved of having fired a shot in the floor of the raided building and the burgess had sent the chief of police to make an investigation. After the hearing before the burgess, held May 19, 1947, the burgess discharged Mike Pihakas for lack of evidence, and on the same day addressed to the borough council a letter which was received by it, as follows:

"This day I have suspended Lieutenant Norbert Lesniakowski from further duty on the police force for seven (7) days without pay and recommend he also be reduced from the rank of lieutenant to patrolman."

No written notice or copy of this was delivered to the demoted officer.

At the next regular meeting of council, it confirmed the recommendation of the burgess. On May 28, 1947, the demoted officer notified the borough secretary, the president of council, and the burgess that he had been suspended on May 19, 1947, and reduced in rank and that no written charges had been filed or furnished to him, and he demanded that this be done. At the same time he gave notice to the chairman of the police civil service commission that no charges had been filed, although he was suspended and reduced in rank.

On August 4, 1947, the borough secretary and the burgess addressed a letter to the Police Civil Service Commission of the Borough of Canonsburg, setting forth:

"Following is a statement of the charges made against Norbert Lesniakowski, who was suspended from duty for seven (7) days and reduced to the rank of patrolman by action of council on May 19, 1947, upon the recommendation of Burgess Harry L. Cook.

"The Burgess and the Town Council of the Borough of Canonsburg charge that on May 4, 1947, Norbert Lesniakowski was inefficient and neglectful in the performance of his duties and conducted himself in a manner unbecoming an officer in a certain unsuccessful raid made at 520 Blaine Avenue, Canonsburg, Pa., and that the raid was made for personal reasons without the knowledge and consent of the chief of police and in disobedience of general orders issued by the chief of police."

A copy of this letter was served on the demoted officer on August 7, 1947, and within five days thereafter he filed an answer denying the charges.

A hearing was held by the Police Civil Service Commission of the Borough of Canonsburg, of which a lengthy record was made consisting of approximately 235 pages, the greater portion of which is irrelevant and immaterial. There is no direct proof of the commission's action. We do not find any report of the commission in the record but assume from the appeal that it was adverse to the demoted officer, and, for the purpose of preventing further delay, we determine this case on its merits, on the assumption that the commission affirmed the action recommended by the burgess.

There is really but one disputed question of fact in this record, and that is: Did the appealing officer fire a shot in the floor outside the door of the gambling room on the morning of May 4, 1947? The only testimony supporting this charge is that of Mike Pihakas and some of his gambler henchmen who were produced at the hearing before the commission. To the contrary is the evidence of several police officers that this shot was accidentally fired while a raid was in progress during the previous January, at which time the officers were endeavoring to break down the iron bound barred door. Our conclusion on what we deem the most reliable evidence is that the shot was not fired on the morning of May 4, 1947. We think the testimony of Mike Pihakas and the witnesses produced by him, namely Louis Zanaskis, who was admittedly in the gambling room and engaged in shooting crap when the officers demanded admission, and Tom Griffith, also engaged in the same place at the same time, is readily understood when we consider the substance of their testimony, viz, that Pihakas produced them and told them that this officer was making it hot for them and they had to make it hot for him.

The law imposes duties and obligations on police officers, and we think properly the higher the rank the higher the duty. Police officers are public servants. The public is entitled to protection by police officers employed at the public expense because it is intended that they should be zealous in the performance of their duties. Under the circumstances appearing in this record, we have no hesitation in finding that the raid was at a proper time and place and was in performance of the duty imposed upon that officer by law. All through this record it is obvious that the place was a gambling house; that it was being operated at and before the time of the raid. No fair minded person can read this record and arrive at a different conclusion. Even if a shot was fired during the raid and interrupted or annoyed those engaged in a criminal act, is that any reason for entering upon an inquisition for the purpose of punishing an officer who was attempting to perform his duty? We do not so understand the proper control and management of a police force.

It is said, although we have been unable to find any definite record of such a rule, that this demoted officer made the raid without the authority and consent of the chief of police and that there was some oral rule or regulation that raids could not be made except on approval and consent of the chief of police. If there is such a rule, it should be immediately abrogated. We know of no reason for such a rule under circumstances such as related by this record except for the protection of criminals, enabling them to escape while red tape is being complied with. The only criticism we would make of this officer's conduct is that apparently he followed the orders of some superior and brought a prosecution under an ordinance which was obviously drawn for the purpose of enabling operators of gambling houses to evade the criminal law.

It is said the raid was unsuccessful. There are many cases, as we observe daily, where prosecutions brought

in good faith and apparently on sufficient evidence, do not result in convictions. That is not the fault of the prosecutor. In this case there was an abundance of evidence that gambling was going on on the third floor of this building and that Mike Pihakas, the owner of the building, was the operator. It is not the fault of the arresting officer that a conviction was not secured. We have not considered the many police department quibbles and griefs displayed in this record. They have no bearing on this case because they are not contained in any charges preferred. The legislature intended that we should consider the evidence. It is the duty of the court to weigh this testimony and reach the conclusion which we determine to be the proper one. We have done so insofar as the facts are concerned.

We might stop here and disregard the other questions raised, but for future cases we think we should proceed further.

Boroughs are governed by law. A police department and the selection of members engaged as such are placed by the General Borough Act and its amendments in the hands of the borough council. After this department has been established and the members have been selected, it is the duty of the burgess to direct the manner in which the duties of policemen shall be performed. The burgess has the power to suspend a policeman for cause until the next regular meeting of council, at which time the borough council may approve the suspension, demote, discharge, or reinstate the policeman.

Orderly procedure requires that the cause for which a policeman is suspended shall be given in writing to the borough council and that the officer involved shall have written notice of the cause. If the policeman employe is dissatisfied by the action of council, then he has his appeal under the Act of June 5, 1941, P. L. 84, which has been passed upon and declared to be

constitutional in Haverford Township et al. v. Siegle et al., 346 Pa. 1.

The Act of June 5, 1941, P. L. 84, states, in section 26:

"It is the purpose of this act to furnish a complete and exclusive system for the appointment, promotion, reduction, suspension or removal of members of the police force in every borough, incorporated town and township of the first class within this Commonwealth which maintains a police force."

The provisions of this act must be strictly followed. Section 20 of the act provides certain reasons, and those only, for which an employe of the police department may be suspended, removed or reduced in rank, and requires that "A written statement of any charges made against any person so employed shall be furnished to such person within five days after the same are filed".

The written charges are those filed with the borough council which is the only body having the power to remove or reduce in rank. It will be noted that the burgess may suspend until the next regular meeting of council, but if he does so it is obvious from the language of the act that written charges must be filed by him with the council under at least one of the various reasons designated by section 20. This is the beginning and foundation of the proceeding for the further suspension, removal or reduction in rank. It is clear that after the council has acted and an employe has been suspended, removed or reduced in rank, he must then apply to the commission demanding a hearing or the action of council is final. The commission is required to grant him a hearing. The charges which were previously acted upon are to be filed with the commission and within five days thereafter the discharged person may file an answer. If the commission shall sustain the charges and order a suspension, removal or reduction of rank, the person so affected has the immediate right to appeal to the court of common

pleas of the county and have the case there determined "as the court deems proper", which appeal must be taken within 60 days from the date of entry by the commission of its final order. The Act of 1941 is not as clear and specific as it well could be, but we agree with the decision of the court of Beaver County in Goehring's Appeal, 57 D. & C. 256, which construes this act and points out in detail the proper procedure in dismissing a borough police officer. It is not necessary to repeat here that procedure or the authorities there cited. It is clear that the charges following all through the case must be those made by the burgess and acted upon by the borough council. The difficulty we first encounter is that in the writing addressed to the borough council, "This day I have suspended Lieutenant Norbert Lesniakowski from further duty on the police force for seven (7) days without pay and recommend he also be reduced from the rank of lieutenant to patrolman", does not contain any charges under the reasons set forth in the Act of 1941. It merely informs the borough council what the burgess has done and his recommendation. There could be no notice to the accused of charges against him for the simple reason that there were none filed. Therefore it is clear that the required notice was not given. Council acted on this communication with no charges being filed and such action was not a compliance with the requirements of the Act of 1941 which provide the only method by which an employe of the police department could be suspended, removed or reduced in rank. This all appears to have taken place about May 19, 1947.

Later, on August 4, 1947, certain charges were filed with the police civil service commission, after action by it had been demanded, which have no resemblance to anything which had been acted upon by the borough council. The charges then appearing were that the accused was "inefficient and neglectful in the perform-

ance of his duties and conducted himself in a manner unbecoming an officer in a certain unsuccessful raid made at 520 Blaine Avenue, Canonsburg, Pa., and that the raid was made for personal reasons without the knowledge and consent of the chief of police and in disobedience of general orders issued by the chief of police". In substance, a new proceeding was begun before the police civil service commission, which previously had no foundation based on any complaint as required by the Act of 1941. This new proceeding or complaint, as it is called, sets forth no facts but merely a conclusion. This may be used as an introductory clause, if it had been followed by a statement of specific facts, so that the commission, and on appeal the court, would know what was alleged. This disregard of proper procedure accounts for a voluminous record containing a great quantity of irrelevant and immaterial matters and confusion all through the proceeding.

As we stated above, we have carefully reviewed this record and we find nothing in it which would justify an affirmative answer to this charge even if it had been the proper form. Instead of inefficiency, the real accusation against the police officer was that he was over-officious, disrupted a gambling game and interfered with the peace and quiet of the game. If he had not done so, he may have been open to the charge which is also contained here, that he was neglectful in the performance of his duty. We have already commented on the charge that the raid was unsuccessful and that it may have been done in disobedience of general orders. There is no evidence that the raid was carried out for personal reasons or for improper purposes. On the contrary, the evidence is clear that a gambling house was being operated at the time and place raided. If a crime is being committed why question the motives of the officer who arrests the criminal?

Another question is raised in this record. The Act of 1941 above referred to, section 3, forbids certain

persons from acting as civil service commissioners. The provision is:

"No commissioner shall at the same time hold an elective or appointed office under the United States government, the Commonwealth of Pennsylvania or any political subdivision of the Commonwealth, except that one member of the commission may be a member of the council of the borough or incorporated town or board of township commissioners, as the case may be."

The act is very specific in this particular. The County of Washington is a subdivision of the Commonwealth of Pennsylvania. The office of Inspector of Weights and Measures of the County of Washington is a public office: Commonwealth ex rel. Lowell v. Hoyt, 254 Pa. 45. The exception that one member of the commission may be a member of the borough council only emphasizes the prohibition as to all others. No councilman holding any other office may be a member of the commission. The office of a member of the civil service commission is incompatible with all other elective or appointed officers simply because the act so provides. It is not open to argument that the prohibition of the Act of 1941 only applies to those who are not members of the borough council. The exception is not to be extended. Therefore, where the chairman of the civil service commission is a public officer holding an office of appointment in any subdivision of the Commonwealth of Pennsylvania, the proceedings before the civil service commission are a nullity. Particularly is this so where the objection was made at the beginning of the proceeding before the commission.

And now, January 19, 1948, the appeal in this case is sustained, the conclusion and order of the police civil service commission are reversed, and it is ordered that the Borough of Canonsburg forthwith reinstate Norbert Lesniakowski to his previous position as lieutenant of police, with such compensation as shall have heretofore been withheld from him by reason of his previous suspension or reduction in rank.